Marjorie Strandquist, Plaintiff-Appellant, v. Albin J. Strandquist, Defendant-Appellee.

Gen. No. 11,258.

Second District, First Division.
June 24, 1959.
Released for publication July 10, 1959.

Pedderson, Menzimer & Conde, of Rockford (Dale F. Conde, Clifford A. Pedderson, of counsel) for plaintiff-appellant.

Miller, Thomas, Hickey & Collins, of Rockford (L. C. Miller, William E. Collins, of counsel) for defendant-appellee.

JUSTICE DOVE delivered the opinion of the court.

On March 27, 1958 Marjorie Strandquist filed in the Circuit Court of Winnebago County her complaint for separate maintenance. The defendant filed his answer thereto and also a counterclaim for divorce. Subsequently plaintiff, by leave of court, amended her complaint and prayed for a divorce and later filed an additional count for separate maintenance. Answers and replies were filed and the issues made by the pleadings were submitted to the chancellor for determination.

At the commencement of the hearing counsel for plaintiff stated that no evidence would be offered by the plaintiff in support of her count for divorce and at the conclusion of the hearing an order was entered, on plaintiff's motion, dismissing the divorce count of the complaint and the court also dismissed the counterclaim of the defendant for divorce for want of equity but directed defendant to pay plaintiff her attorney fees. The court also dismissed plaintiff's complaint for separate maintenance and to reverse that order plaintiff appeals.

From the pleadings and evidence it appears that the parties hereto were married on July 17, 1919 and at the time of the hearing the plaintiff was 61 years of age and the defendant 59. They have two adult children, Janice 22 years of age and Jack 34 years of age. For many years the family lived in a large and commodious home in Rockford and the parties to this proceeding and their daughter Janice were living there on December 30, 1957 when Mr. Strandquist and Janice left. Mrs. Strandquist continued to live in the home after her husband and daughter left and was living there when this case was heard.

Just when the son, Jack, left home does not appear. He is engaged in the automobile business and lives in Rockford and has a summer home on Lake Geneva within a block of the summer home of his parents. In June 1957 his wife left him and shortly thereafter the parties were divorced. Appellant opposed Jack's contemplated second marriage to Ellen Clonsett and upon the hearing of the instant case Jack testified on behalf of his father and related an episode when he was called to the home of his parents who were having an argument. In the course of this argument Jack testified that his mother told his father that he "should get out as there was no way to get along with him." Jack further testified that because of his mother's conduct toward him and his father he did not go to their home from July 1954 until Christmas 1955 and that during this period his parents did not visit in his (Jack's) home and that on December 3, 1957 his mother told him that if he married Ellen Clonsett "he would no longer be welcome at his parents' home."

Janice Strandquist was living with her parents in the fall of 1957 and contemplated getting married. Appellant did not like her fiance and on December 17, 1957, the minister of the church with which the family was affiliated called at the Strandquist home

109

where appellant, appellee and Janice were then living and upon that occasion Janice testified that her mother told the minister that Janice's fiance was no good; that he would not work, that he was lazy and would not be good to Janice and that she, appellant, would have nothing to do with the approaching marriage of her daughter. Janice further testified that five days later her mother told her that she might as well get out if she insisted in seeing and being with her fiance, as she had told Janice's fiance that he couldn't step in her house because she, appellant, owned half of it. The next day Janice did leave the home of her parents and for a week thereafter made her home with her brother, Jack.

Mr. Strandquist testified that he came home about five o'clock on the evening of December 17, 1957 and arrived before the minister of the church had left and in many particulars corroborated the testimony of his daughter. He further testified that on December 23, 1957 he and his wife were discussing their children and reference was made to the fact that she had previously forbidden Janice's fiance to set foot on her property. According to appellee's testimony his wife then said to him "You better get out too, you have stolen the love of my daughter and you have taken her away from me. Now you better get out too." To which defendant testified that he replied: "Listen dear, why don't we sit down and talk this over. Let's let the children live their lives. I have said this to you repeatedly and we will live our lives and enjoy ourselves in our later years."

Upon this occasion and while appellee and appellant were discussing their children Glen Hansen, a professional carpet cleaner came to the Strandquist home to remove the rug and he testified that while there he heard portions of what was said by the parties and

110

that upon this occasion Mrs. Strandquist requested her husband to get his things and leave the home.

After a week's absence Janice returned to the home of her parents but left with her father on the evening of December 30, 1957. As abstracted by counsel for appellant the following is the version of appellee as to what occurred. "I arrived home from the office about 4:30 in the afternoon. I walked into the house and Janice was sitting in the living room and I said to Janice, 'Is it going to work'? Mrs. Strandquist screamed from the other room: 'Now you are talking about me, you are whispering about me.' I said: 'No, we're not.'—Mother said: 'You better get out.' I said: 'Well, Janice tried to come home and apparently there isn't anything, it hasn't worked.' And she was enraged and said, 'well you get out.' I said to her: 'Maybe you had better get out once. Maybe that would solve the problem we are having. I am always the one that is out. Maybe you better get out.' She said: 'This is my house and I'll stay here. You get out, or I'll get the law.' I said: 'Get the militia, if you like, I won't go until I'm ready.' With that she slapped me in the face. I said: 'Well, I guess we're not going to be able to resolve this, but once more, let me say to you dear, why can't you let the children live their lives and we live ours and enjoy ourselves in the last few years.' She said: 'I'm going to get a lawyer, and I'm going to show you who's boss around here. You've pushed me around long enough.' I said: 'I haven't pushed you around.' She then put her coat on and said: 'If you think Roberta (Jack's former wife) spent Jack's money I'll show you how to spend money.' She left. Janice and I stayed there an hour and a half or two hours after she left but she did not return during that time. I took my clothing and left the house. Janice had some of hers and I had some of mine."

111

In rebuttal Mrs. Strandquist denied she struck her husband on December 30, 1957 or at any other time and stated that when Janice left the home about December 17, 1957 she said to her: "Janice, you are all I have, honey, and if you want to marry him its alright." She testified that previously she had told Janice that she thought it would be best if Janice and her fiance didn't see each other.

Appellant's testimony as to what occurred on December 30, 1957 was that her husband came home and asked why Janice was there and thereupon Janice whispered something in her father's ear and appellant then inquired why they were talking about her. As abstracted by her counsel she then testified: "They started screaming at me. My husband started screaming at me. I said I just wanted her (Janice) to come home and forget it all. And he (appellee) said: 'She can marry him if she wants to. Do you want her to be an old maid and live at home with us the rest of her life'? There was nothing said about him leaving. I didn't tell him to leave the house and not come back. He was there until 6 o'clock. Janice whispered something to Mr. Strandquist. We didn't say very much of anything. He just got angry at me because I didn't want her to marry this boy. I said to Mr. Strandquist, 'He's lazy and you know he is lazy.' And he said: 'If he never works a day. She can have him.' I had to go shopping and I got my coat and went out and when I came back they had moved. At no time on that day did I tell Mr. Strandquist or order him to leave the house and not to come back. There was no one else present at the time this conversation took place other than myself, Mr. Strandquist and Janice. I did not have an argument with my husband on December 24th, I remember the day Glen Hansen was taking up the carpet to clean it, that was December 24th. He was yelling at me when Glen was there taking up the rug.

112

He gets very furious so I was scared. I said: 'You better leave, I'm getting very nervous.' I did not tell him not to come back. That was the only time I ever told Mr. Strandquist to leave the house."

The foregoing is a fair resume of the evidence found in this record as to the cause of the separation of the parties hereto. It is the contention of counsel for appellant that appellant is living separate and apart from her husband without fault on her part and that the decree is manifestly against the weight of the evidence. Counsel argue that what the chancellor should have done in the instant case was to find that appellant was entitled to separate maintenance and determine the amount thereof by adding to the wife's annual income, the income of her husband and then determine what amount should be allowed to appellant from the aggregate incomes and having so determined, the chancellor should then deduct therefrom the wife's separate income and the remainder would be the proper annual allowance.

██ In order to avail herself of the statutory remedy of separate maintenance the burden rested upon appellant to establish two things, first that she was living separate and apart from her husband and second that she is so living without fault on her part. (Ill. Rev. St. 1957, Chap. 68, sec. 22; Hoffman v. Hoffman, 330 Ill. 413, 418.) In Umlauf v. Umlauf, 117 Ill. 580 at page 585 it is said: "The statute authorizing actions for separate maintenance was adopted for the exclusive benefit of those whose conduct has not materially contributed to a disruption of the marital relations. If the wife, therefore, in bringing a suit of this kind, is not prepared to show that she is without fault, she will fail to bring herself within the statute, and must necessarily be defeated in her action."

The complaint upon which appellant sought relief alleged that her husband, disregarding his marriage

vows and without just provocation, on December 30, 1957, abandoned and absented himself from the plaintiff and their home and has since lived separate and apart from the plaintiff. The chancellor found that plaintiff had not sustained this allegation but that appellee had just provocation for leaving. The record does show that appellant is living in the home formerly occupied by the parties hereto and that appellee was not living there and had not been since December 30, 1957. But it clearly appears that for some time previous to December 30, 1957 appellant engaged in a course of conduct which alienated her from her son and daughter and which culminated in her husband and daughter leaving the family home on December 30, 1957.

As to the financial condition of the parties to this proceeding the evidence is that appellee was at the time of the hearing and had been for twenty years the president of the National Lock Company. During the year 1957 he received from the company a fixed salary of $44,500 and a bonus of $36,000. It was stipulated that in addition to the foregoing salary and bonus his 1957 income tax return disclosed that during the year he received in capital gains $128,990.20, interest amounting to $2,567.77 and dividends aggregating $18,318.60 or a total of $230,376.57. It was also stipulated that appellant's 1957 income amounted to $14,082.99. Of this amount $5,000 was received by her as dividends from stock she owned in National Lock Company; $4,500 in dividends on her stock in Keystone Steel Company; $313.50 in dividends from Rockwell Spring and Axle Company; $250 from Continental Steel Corporation; $181.11 from interest on her savings and $3,570.31 from rent.

 It also appears that the title to the residence where she lives in Rockford and also the title to the Lake Geneva residence are held by the parties hereto

114

in either joint tenancy or as tenants in common; that the value of the Rockford home with its furnishings is about $70,000 and their equity in the Lake Geneva property is around $30,000. The parties are also the owners of a breeding stable partnership, the assets of which are real estate and horses all having a value of $225,000. It further appears that since his marriage, appellee created a trust for the benefit of appellant referred to in the record as Trust No. 1001. The securities in this trust had a value, at the time of the hearing, of $159,200. In the past the income from these securities remained in the trust but appellant is the life beneficiary thereof and entitled, if she desires, to receive the income therefrom. It is asserted by counsel for appellee and it is not contradicted that appellant had property in her own name of a value of approximately $600,000. From the foregoing analysis of the property of the parties hereto, counsel for appellant insists that appellant should not be required to exhaust her own resources before she is entitled to receive separate maintenance from her husband and that in the instant case appellee should be decreed to pay appellant at least $32,000 per year while they remain living separate and apart. Having concluded that the decree of the chancellor is not manifestly against the weight of the evidence but is supported by the evidence, it is unnecessary to consider this contention.

Prior to appellee's departure from the home on the evening of December 30, 1957, the record discloses that appellant had seen her lawyer on two occasions in connection with her domestic difficulties. It is unfortunate that the parties hereto disagreed about their children. It is undenied that upon several occasions appellee urged his wife to permit their children to live their own lives and to accept conditions as they existed and over which neither of the parties to this

115

litigation could exercise any control. She was unable to do so altho she and her husband had raised their children to maturity and she and her husband had lived together for more than 38 years. Material blessings were in abundance in this unhappy household but the possession of those material things did not solve the difficulties which this husband and wife encountered.

The record fully sustains the finding of the chancellor that appellant has sufficient income to support herself and the decree dismissing the complaint for want of equity is sustained by the evidence.

Decree affirmed.

SPIVEY, P. J. and McNEAL, J., concur.